UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WOODS VIEW II, LLC, a Washington limited liability company, et al.,

Plaintiffs,

v.

KITSAP COUNTY, a Washington municipality, et al.,

Defendants.

CASE NO. C10-5114BHS

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DECLINING JURISDICTION OVER REMAINING STATE LAW CLAIMS, AND DENYING AS MOOT PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND TO COMPEL PRODUCTION

This matter comes before the Court on Defendants' motion for summary judgment as to all claims (Dkt. 24), Plaintiffs' motion for partial summary judgment (Dkt. 35), and Plaintiffs' motion to compel (Dkt. 58). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants Defendants' motion in part, denies Plaintiffs' motion, and declines supplemental jurisdiction over Plaintiffs' remaining state law claims.

**I. PROCEDURAL HISTORY**

On March 10, 2011, Defendants moved for summary judgment. Dkt. 24. On April 15, 2011, Plaintiffs filed their amended response in opposition to the motion. Dkt. 38. On April, 22, 2011, Defendants replied.

ORDER - 1

On April 7, 2011, Plaintiffs filed a motion for partial summary judgment to dismiss Defendants' Anti-SLAPP counterclaim and affirmative defense. Dkt. 35. On April 26, 2011, Defendants responded in opposition to the motion. Dkt. 56. On May 12, 2011, Plaintiffs replied. Dkt. 70.

On April 28, 2011, Plaintiffs filed a motion to compel production of documents. Dkt. 58. On May 4, 2011, Defendants responded in opposition. Dkt. 63. On May 12, 2011, Plaintiffs replied. Dkt. 69.

## II. FACTUAL BACKGROUND

This action arises out of Plaintiffs' challenge to events that led up to its residential development going into foreclosure. *See generally* Amended Complaint (Dkt. 1-3). Plaintiff Woods View II, LLC ("Woods View") owned several "legacy lots" in Kitsap County, which were platted, 40 feet wide by 100 feet deep, in or about 1909. *Id*. ¶ 8. Woods View and/or Darlene A. Piper ("Piper") acquired legal title to these contiguous legacy lots with an aggregate property size of 19.76 acres (the "Site"). *Id*. ¶ 9. The Site "is titled solely in Woods View" and Woods View is the "sole owner of the [Site]." *Id. ¶* 17.

Woods View designed and proposed a residential development for 78 single-family homes that it would construct on the Site. *Id*. ¶ 10. The Washington Department of Health ("DOH") regulations in place at all relevant times, however, prevented Woods View from relying on individual septic systems for each of the proposed 78 residences. *Id*. Instead, in cases such as this (small lots, many homes), the DOH may authorize the use of a Large Onsite Sewage System ("LOSS"). *Id*.[1] Woods View determined that a LOSS was the means by which it could provide septic to its development and still obtain approval for its proposed development at the Site. *See id*.

---

[1] "A LOSS . . . does not require a single septic system for each residence, but instead utilizes a shared waste treatment system and drainfield." Complaint ¶ 10.

ORDER - 2

On or about April 3, 2006, Woods View applied to Kitsap County for a Site Development Activity Permit ("SDAP") for its proposed Site. *Id.* ¶ 12. All required materials for SDAP approval were submitted on or before May 5, 2006. *Id.* Kitsap County provided preliminary approval of the SDAP on or before November 26, 2007; it made a final decision on June 9, 2008. *Id.*

On or about April 14, 2006, Woods View applied to Kitsap County for State Environmental Protection Act ("SEPA") approval. *Id.* ¶ 13. Plaintiffs allege that Defendants Chris Gears ("Gears") and/or Larry Keeton ("Keeton") delayed the application process. *Id.* Kitsap County also issued a "Mitigated Determination of Non-Significance" on January 4, 2007. *Id.*

When a developer intends to utilize a LOSS, DOH requires a management plan that describes what entity will maintain the LOSS. *Id.* ¶ 14 (citing WAC 246-272-B-08001). When, as here, lots are individually owned, the applicable code provides that a public entity may serve as the primary management entity or as a third party trust when a private management entity is used to maintain the LOSS. *Id.* Initially, Woods View agreed with Karcher Creek Sewer District ("Karcher Creek") that it, as a public entity, would maage the LOSS. *Id.*

Woods View alleges that

> On October 13, 2006, in furtherance of Kitsap County's plan to attempt to prevent the proposed development, Gears wrote a letter to several Washington State officials, including Governor Christine Gregoire, the Director of the Washington Department of Ecology, and the Washington Secretary of Health. In the letter Gears informed these officials that the LOSS system proposed for the Woods View site would "require approval from either the State Department of Ecology or Department of Health." Gears further informed these officials that Kitsap County was concerned that approval of the LOSS system proposed for the Woods View site would "allow the development of urban densities outside an urban growth area"; that "[w]hile [Kitsap] County has no authority to approve the proposed wastewater system, . . . if this waste water system is approved [Kitsap] County will be obligated to issue building permits as a ministerial act"; that "this creates problems for Kitsap County"; and that "the use of new wastewater systems that allow development on small nonconforming lots in

ORDER - 3

the rural areas aggravates the situation." Upon information and belief, Gears
believed that the State officials to whom he had addressed this letter would
assist Kitsap County in preventing the development of the Woods View site
as proposed by Woods View II. Gears and/or Keeton directed Kitsap
County Department of Community Development staff not to process Woods
View II's SDAP and SEPA applications until the State officials to whom he
had addressed his letter responded to his concerns expressed in it.
     16. Kitsap County believed that if Woods View II had no public
entity to serve as the primary management entity for the LOSS proposed for
the Woods View site, it would be unable to obtain approval of the LOSS
from the Sate of Washington, [DOH], and the proposed development at the
site would be prevented. Accordingly, in October and November 2006,
Kitsap County employees, upon information and belief[,] including Gears,
Keeton, and [Shelley] Kneip communicated with [Karcher Creek] for the
purpose of attempting to persuade it to withdraw from its agreement to
serve as the entity that would monitor, maintain, and be responsible for the
LOSS for the Woods View site. As a result of these communications,
Karcher Creek . . . withdrew its agreement to provide management services
for the LOSS to the Woods View site.
\*\*\*
     18. On July 25, 2007, Keeton, as Director of the Kitsap County
Department of Community Development, issued a "Director's
Interpretation" of Kitsap County Ordinance 090-1998, which establishes the
circumstances under which connections to public sanitary sewer systems
are allowed outside of designated urban growth areas . . . . The Woods
View site is located outside of a designated Urban Growth Area. In
Keeton's "Interpretation," he ruled that a LOSS operated by a public entity
constituted a public sewer, and thus would not be permitted in areas not
designated as Urban Growth Areas. However, Keeton's "Interpretation"
further states that a LOSS privately owned, operated, and maintained would
not be considered a public sewer.

*Id*. ¶¶ 15, 16, 18.

In 2009, Woods View negotiated a new agreement with a new public entity to maintain its proposed LOSS. *Id*. ¶ 20. Woods View requested that the DOH approve the LOSS based on its new management agreement. *Id*. Woods View alleges that, after becoming aware of the new agreement, Kitsap County, through statements made by Keeton and Kneip, communicated with the DOH to inform them that such an agreement would not be permitted in Kitsap County. *Id*.

Woods View contends that it would have been able to sell finished lots no later than 2007 had it not been prevented from doing so by the acts described above. Due to the financial circumstances it found itself in, Woods View sought a lender that would

ORDER - 4

"provide development and construction financing for the proposed development"; these efforts were successful. *Id*. ¶ 23. However, Woods View contends that the lending arrangement collapsed because Kitsap County, through Shelley Kneip ("Kneip"), communicated with the lender and informed it that the Woods View would never be permitted to sell individual building lots.

Based on the foregoing, Plaintiffs seek damages under the following causes of action: (1) tortious interference with a contract and/or business expectancy; (2) negligence; (3) outrage; (4) violation of the Fifth Amendment, substantive due process; (5) violation of the Fifth Amendment, procedural due process; and (6) violation of the Fifth Amendment, taking. *Id.* ¶¶ 26-36. Plaintiffs also seek declaratory and injunctive relief, punitive damages, and attorneys fees. *Id*. ¶¶ 37-39.

### III. DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B. Standing**

As a preliminary matter, Defendants argue that Piper lacks standing to pursue the causes of action alleged and that those claims are solely Woods View's as an LLC. Dkt. 24 at 8. Although Plaintiffs contend that Piper may have owned the Site that Woods View later acquired, Plaintiffs also assert that the Site "is titled solely [to] Woods View" and Woods View is the "sole owner of the [Site]." Complaint ¶ 17. The only other fact asserted by Woods View on this point is that Piper supplied funds and personally guaranteed loans for the purchase and development of Woods View. *Id*. at 21.

A plaintiff must have standing to sue. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). Whether a plaintiff has standing is a question of law for the Court to decide. *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1454 (9th Cir. 1995). Corporations and limited liability companies ("LLC") are distinct legal entities, i.e., separate from their

shareholders or members. *Abrahim & Sons, Enterprises v. Equilon Enterprises, LLC*, 292 F.3d 958, 962 (9th Cir. 2002).

A "shareholder does not have standing to redress an injury to the corporation." *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983); *United States v. Stonehill*, 83 F.3d 1156, 1160 (9th Cir. 1996) ("Well-established principles of corporate law prevent a shareholder from bringing an individual direct cause of action for an injury done to the corporation or its property by a third party."). For example, the Ninth Circuit has held that even the sole shareholder and personal guarantor of a corporation has no standing to pursue antitrust claims on the corporation's behalf. *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439 (9th Cir. 1979). Similarly, a shareholder or corporate guarantor cannot bring a RICO (Racketeering Influenced & Corrupt Organizations Act) claim to recover for acts that diminish the value of the corporation. *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 640 (9th Cir. 1998). Similarly, under Washington law, the guarantor of a contract has no standing to affirmatively pursue redress for a breach of the contract. *Miller v. United States Bank, N.A.*, 865 P.2d 536 (1994).

To establish standing, Piper would have to allege a direct injury that is independent of Woods View's injury. *Shell Petroleum*, 709 F.2d at 595; *In re Real Marketing Svcs., LLC*, 309 B.R. 783, 789 (S.D. Cal. 2004). Piper has arguably shown, at least on the pleadings, that she suffered personal economic loss as a result of Defendants' alleged wrongdoing. This is insufficient, however, because her personal loss derives from her membership in the LLC. *Shell Petroleum*, 709 F.2d at 595; *Real Marketing*, 309 B.R. at 789; *see also Sparling*, 864 F.2d at 640; *Sabey v. Howard Johnson & Co.*, 5 P.3d 730, 735 (2000). Instead of a derivative loss, Piper must allege that she suffered an injury distinct from those of any other LLC member, or that there was a special relationship between herself and the Defendants. *Sparling*, 864 F.2d at 640.

ORDER - 7

However, Plaintiffs have not supplied competent evidence that any of Piper's alleged injuries either derive independently of Woods View's harm or that Piper was owed any special duty by Defendants. Guaranteeing loans for Woods View that results in separate action against Piper is insufficient to constitute an independent harm; such events would not occur but for the harm allegedly caused to Woods View.

Plaintiffs have failed to provide adequate case law to permit this Court to rule contrary to the aforementioned cases. Therefore, like the court in *Real Marketing*, this Court concludes that Piper's claims are derivative of her interest in Woods View. *See* 309 B.R. at 789 (dismissing breach of contract claim), 791 (dismissing fraud and misrepresentation claims), 792 (dismissing tortious interference with contract claim). In short, Piper's claims fail because she lacks standing to pursue them; the complaint reveals that the only Plaintiff with standing to assert the claims before the Court is Woods View.[2]

The Court rules herein on Piper's failure to establish standing so far is it pertains to the federal claims alleged by her and Woods View.

**C.     Defendants' Motion for Summary Judgment, Federal Claims**

With the foregoing in mind, the Court turns now to Woods View's federal § 1983 claims.

**1.     Ripeness**

Defendants argue that Woods View's § 1983 claims are not ripe. Dkt. 24 at 19. The Supreme Court has established what is needed for a § 1983 claim to be ripe in the land use context:

> The Supreme Court has recognized that land-use planning is not an all-or-nothing proposition. A government entity is not required to permit a landowner to develop property to the full extent it may desire. Denial of the intensive development desired by a landowner does not preclude less intensive, but still valuable development. The local agencies charged with

---

[2]Because Piper lacks standing, only one Plaintiff remains: Woods View. The Court will no longer refer to "Plaintiffs' claims" and will instead refer to "Woods View's claims."

ORDER - 8

administering regulations governing property development are singularly flexible institutions; what they take with the one hand they may give back with the other. The property owner, therefore, has a high burden of proving that a final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds.

*Hoehne v. County of San Benito*, 870 F.2d 529, 533 (9th Cir. 1989) (citations and quotations omitted). And, to prove that a final decision was indeed reached, the facts of the case must be clear, complete, and unambiguous. *Id*.

Specifically related to ripeness of "takings" claims, the Supreme Court requires the ability to review a final and determinative ruling before it will find a takings claim ripe:

[T]he nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone "too far" unless it knows how far the regulation goes. As Justice Holmes emphasized throughout his opinion for the Court in *Pennsylvania Coal Co. v. Mahon*, 260 U.S., at 416, "this is a question of degree-and therefore cannot be disposed of by general propositions."

*MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1980). The Supreme Court reaffirmed *MacDonald* in 1985:

As in Hodel, Agins, and Penn Central, then, respondent has not yet obtained a final decision regarding how it will be allowed to develop its property. Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty, this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

*Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985) (citations omitted).

Woods View argues that the defense of ripeness should fail because, although its permit applications were approved, Defendants knew that they were delaying the process unduly in an effort to bleed the project dry until it failed. *See* Dkt. 38 at 24-25.

However, Woods View points to no proceedings in which it challenged any of the regulations at issue to obtain a final determination of its rights. It supplies no authority for the proposition that the requirement of a final determination hearing may be avoided and survive a ripeness issue when the party successfully obtains the permit sought after some amount of time but believes that the permitting authority has intentionally slighted them in the process.

Because Woods View never sought final review and determination of their rights as required for their federal constitutional claims to be ripe before this Court, their claims are not ripe. Woods View has also not established by competent evidence that the record, as it pertains to ripeness, is clear, complete, and unambiguous. Therefore, the Court grants summary judgment on this basis, which dispenses with Woods View's § 1983 claims - it asserts no other federal claims.

Even if the Court found Woods View's § 1983 claims to be ripe, its due process and takings claims fail nonetheless. The Court turns now to those claims.

### 2. Substantive Due Process

To sustain a federal substantive due process claim, a plaintiff must prove that the government's action was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *E.g., Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926) (citations omitted). The Ninth Circuit has articulated the heavy burden that must be met by a plaintiff like Woods View on such a substantive due process claim:

> [T]he protection from governmental action provided by substantive due process has most often been reserved for the vindication of fundamental rights. *See Albright v. Oliver*, 510 U.S. 266 (1994) ("The protections of

> substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."); *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that it was improper to analyze an excessive force claim under substantive due process where a specific constitutional provision was applicable). "[T]he [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115 (1992). Accordingly, where, as here, the plaintiffs rely on substantive due process to challenge governmental action that does not impinge on fundamental rights, "we do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did." *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 66 (9th Cir. 1994).

*Halverson v. Skagit County*, 42 F.3d 1257, 1262 (1994). Like the plaintiff in *Halverson*, Woods View, "in choosing to base their claim for compensation on an alleged violation of substantive due process, . . . shoulder[s] a heavy burden." *Id*.

In order to survive Defendants' motion for summary judgment, Woods View must demonstrate the irrational nature of the County's actions by showing that the County "could have had no legitimate reason for its decision." If it is "at least fairly debatable" that the County's conduct is rationally related to a legitimate governmental interest, there has been no violation of substantive due process. *Id*. (citations omitted). "Federal judicial interference with a local government zoning decision is proper only where the government body could have no legitimate reason for its decision." *Dodd v. Hood River County*, 59 F.3d 852, 864 (9th Cir. 1995) (citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981)). Specifically applicable here, courts, in analyzing a substantive due process claim in the context of land use permitting, apply the "shocks-the-conscience" standard. *E.g., Mongeau v. City of Marlborough*, 492 F.3d 14 (1st Cir. 2007); *Torromeo v. Town of Fremont*, *New Hampshire*, 438 F.3d 113 (1st Cir. 2006).

In *Mongeau*, a developer claimed a deprivation of property without substantive due process. Plaintiff Mongeau alleged that Stephen Reid, the City's Commissioner of Inspectional Services, denied him a building permit and interfered in the zoning process

ORDER - 11

for improper reasons. The court held that the shocks-the-conscience standard applied to the substantive due process claim, and that the city official's conduct in opposing the developer's building permit did not shock the conscience. The court stated:

> If Mongeau believes that the City or Reid has wrongly charged or demanded too much for his building permit, he may find recourse in other laws, but not in the substantive component of the Due Process Clause of the Fourteenth Amendment. Such conduct, without more, cannot be said to transgress "some basic and fundamental principle . . . [such] that 'the constitutional line has been crossed'" and our conscience is shocked.

*Mongeau*, 492 F.3d at 20.

In *Torromeo*, 438 F.3d at 118, the court held that the town's unjustified delay in issuing previously approved building permits after enacting a growth control ordinance did not shock the conscience, and thus did not deprive the plaintiff of property without substantive due process, even though the town did not follow procedures mandated by state law in enacting the ordinance. The court reasoned:

> This Court has repeatedly held that rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process. Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation. The doctrine of substantive due process does not protect individuals from all governmental actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational in that it is not sufficiently keyed to any legitimate state interest. Although we have the left door [sic] slightly ajar for federal relief in truly horrendous situations, the threshold for establishing the requisite abuse of government power is a high one indeed.

*Id.*, at 118. *Accord SFW Arecibo Ltd. v. Rodríguez*, 415 F.3d 135, 141 (1st Cir. 2005).

Here, Woods View obtained the permits it sought, though it asserts the delay in obtaining the permits was undue, arbitrary, and capricious. However, Woods View has not supplied competent evidence that this is one of the truly horrendous situations in which the courts have left the door slightly ajar to remedy. Woods View has not supplied competent evidence that one would be unable to fairly debate whether Defendants acted in a manner that was rationally related to a legitimate governmental interest. In contrast,

ORDER - 12

Defendants have adequately established on at least a fairly debatable basis that they acted in a manner that was rationally related to the governmental interest in public health as it relates to permitting a LOSS in an urban growth area in a manner required by the comprehensive plan in effect.

In short, Woods View cannot establish a federal substantive due process claim because the claim is not ripe. And it fails because Woods View has not supplied competent evidence that shocks the conscience regarding the events at issue herein, which is required to succeed in their substantive due process claim.

Therefore, the Court grants summary judgment on this issue in favor of Defendants.

### 3. Procedural Due Process

Woods View also asserts a claim for violation of procedural due process. The fundamental requirement of federal procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *SEC v. McCarthy*, 322 F.3d 650, 659 (9th Cir. 2003) (citing *Mathews*, 424 U.S. 333). To succeed on a deprivation of procedural due process claim, an individual must show: (1) he possessed a protected interest to which due process protections were applicable; and (2) he was not afforded an appropriate level of process. *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008).

It is undisputed that Woods View took part in numerous hearings regarding its development, specifically regarding the LOSS. It is undisputed that the permits were conditionally granted. It is also undisputed that Woods View did not seek additional hearings to contest any issues it had with the granted permits or the permitting process to which it was a part.

Woods View has failed to articulate how it was deprived of a meaningful opportunity to be heard. Woods View does not provide any authority that would exempt it

ORDER - 13

from needing to seek administrative review regarding the alleged improper actions of Defendants. *See* Dkt. 38 at 25-30 (failing to establish that Woods View took advantage of or was denied meaningful review opportunities sought, nor providing authority on which to be found exempt from such requirement). Woods View simply argues that its permit applications were improperly and inordinately time delayed by the alleged intermeddling of Defendants.

In short, Woods View cannot establish a federal procedural due process claim because the claim is not ripe. Moreover, even if the claim was ripe, the Court finds that Woods View's contentions do not support a procedural due process claim. The fact that Woods View may have suffered damages due to a perceived delay in the permitting process does not, per se, provide it with a federal procedural due process claim. Simply stated, Woods View did not avail itself of the requisite, available administrative review procedures that would permit it to now bring its procedural due process claim before this Court.

Therefore, Woods View's procedural due process claim fails as a matter of law.

**4. Taking**

Under the federal constitution, the federal government may "take" private property, requiring just compensation, either by physical invasion or by regulation. *American Pelagic Fishing Co., L.P. v. U.S.*, 379 F.3d 1363 (Fed. Cir.), *cert. denied*, 545 U.S. 1139 (2004). *Norman v. U.S.*, 63 Fed. Cl. 231 (2003), *aff'd*, 429 F.3d 1081, *cert. denied*, 547 U.S. 1147 (2003). In other words, in federal takings jurisprudence, takings are generally physical or regulatory. *See id.*

Woods View asserts that it is not alleging a regulatory taking (Dkt. 38 at 21) regarding overly broad or otherwise unconstitutional land use regulations. It is also not alleging that a physical taking occurred. Instead, it is alleging that a temporary taking

occurred because Defendants caused an inordinate delay in the approval of its LOSS permit, which was approved within a year of application.

However, it has not cited adequate authority to support its position. To begin with, Woods View contends it is making a regulatory taking claim in the form of an alleged "temporary taking," which it bases on extraordinary delay in the permit process. Dkt. 38 at 22. A regulatory taking is one in which the regulation denies an owner of land all economic viable use of that land. *See Penn Central Transp. Co. v. New York*, 438 U.S. 104, 124 (1978).

Woods View has not supplied any authority for the proposition that it is not subject to the requirement of showing sufficient economic loss to sustain such a regulatory taking claim. *See, e.g., Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (*Tahoe-Sierra*) (holding that a 32-month temporary restriction does not constitute a taking because the property owner would regain the use of that property after the moratorium and it did not deprive the owner of all economic use of that property); *Buckles v. King County*, 191 F.3d 1127, 1140 (regulatory takings claims fail when an owner cannot establish that a regulation denied the owner all economic use of the land and the regulation advances legitimate government interest).

Again, Woods View cannot establish a federal takings claim because the claim is not ripe. It also fails because it has not established with competent evidence that a physical or regulatory taking occurred here because Woods View did not suffer any taking like a permanent, physical occupation of the property, nor was it denied all economically viable use of the property. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322-23 (2002).

Therefore, the Court grants summary judgment in favor of Defendants on this issue.

1  **D.  Jurisdiction**

In addition to its § 1983 claims, Woods View alleges state law causes of action for negligence, tortious interference with a contract/business expectancy, and outrage.

This action was removed to federal court on the basis of federal question jurisdiction pursuant to Woods View's 42 U.S.C. § 1983 claims. Dkt. 1. The complaint asserts no basis for diversity jurisdiction. As such, all state law claims can only be before this Court pursuant to supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). The district court may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction. *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1000 n. 2 (9th Cir. 1997). Given that the Court has dismissed the federal cause of action giving rise to this Court's original jurisdiction, and Plaintiffs' remaining state law claims raise land use issues more appropriately determined by the state courts, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See West Coast, Inc. v. Snohomish County*, 33 F. Supp. 2d 924 (W.D. Wash. 1999).

Because the Court finds that Woods View has failed to raise a genuine issue of fact supporting its 42 U.S.C. § 1983 claims for violation of substantive, procedural due process, and right against unconstitutional "takings," the Court declines jurisdiction over Woods View's state law claims.

**E.  Woods View's Motion to Compel and for Partial Summary Judgment**

Because the Court grants summary judgment in favor of Defendants as discussed herein and declines to exercise supplemental jurisdiction over the remaining state law claims, Woods View's motions for partial summary judgment and to compel are denied as moot.

**IV. ORDER**

Therefore, it is hereby **ORDERED** that

(1) Defendants' motion for summary judgment is **GRANTED in part** as discussed herein;

(2) The Court **DECLINES** supplemental jurisdiction over Wood View's remaining state law claims.

(3) The Court **DISMISSES** Woods View's state law claims **without prejudice**;

(4) The Court **DENIES as moot** Woods View's motion for partial summary judgment and its motion to compel as discussed herein; and

(5) There being no other matters in this case, the case is **TERMINATED**.

DATED this 22nd day of June, 2011.

_____
BENJAMIN H. SETTLE
United States District Judge